
FILED
IN OPEN COURT
AUG 29 2019
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 1:19cr252 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 1349 |
| | ) | (Conspiracy to Commit Wire Fraud) |
| JOHN BARON ROYAL, | ) | |
|    a/k/a Jon Vic | ) | Counts 2-4: 18 U.S.C. §§ 1343 and 2 |
|    a/k/a John Vick | ) | (Wire Fraud) |
|    a/k/a Dr. Jon Vic | ) | |
|    a/k/a Dr. John Harris | ) | Count 5: 18 U.S.C. § 1956(h) |
|    a/k/a John Acevedo | ) | (Money Laundering Conspiracy) |
|    (Counts 1-8) | ) | |
| | ) | Counts 6–8: 18 U.S.C §§ 1956 and 2 |
| | ) | (Money Laundering) |
| and | ) | |
| | ) | Forfeiture Notice |
| KEVIN JAMES BINNEY, | ) | |
|    (Counts 1, 5-8) | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**Indictment**

August 2019 Term – at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment, unless otherwise stated:

*Relevant Persons, Entities, and Terms*

1. JOHN BARON ROYAL ("ROYAL") resided previously in Atlanta, Georgia; Delray Beach, Florida; and throughout the Commonwealth of Virginia, including Chesterfield, Ashburn, and Leesburg. ROYAL held himself out as engaged in various business enterprises, including the sale of high-end and luxury vehicles for export.

2. A.H. was the parent of ROYAL's child and also handled finances for ROYAL's

1

various businesses. A.H., at ROYAL's direction, established two companies—AMR Consulting and Highline Auto Brokers LLC ("HAB"). On or about July 11, 2014, A.H. opened a business checking account for AMR Consulting with Union Bank, account ending in 2648. A.H. was the sole signatory on the account.

3. HAB was incorporated in the Commonwealth of Virginia on or about December 18, 2014. A.H. was the registered agent of the company, and its office address was listed in Ashburn, Virginia, within the Eastern District of Virginia. A.H. maintained a business checking account for HAB with Capital One, account ending in 9641. The account was opened on or about February 9, 2015. A.H. was the sole signatory on the account.

4. In or around 2015, defendant KEVIN JAMES BINNEY ("BINNEY") began working for ROYAL. BINNEY's duties included locating high-end vehicles for "straw buyers" to purchase and assisting with managing finances for ROYAL.

5. On or about April 20, 2015, BINNEY opened a business called Capital Highline LLC ("Capital Highline"). Capital Highline was organized under the laws of the State of Florida. BINNEY was listed as the registered agent for Capital Highline.

6. On or about April 20, 2015, BINNEY opened a business bank account for Capital Highline at SunTrust Bank, account ending in 0106. BINNEY was listed as the President of Capital Highline and was the sole signatory on the account.

7. From in or around July 2015 through at least in or around September 2015, BINNEY resided with ROYAL and A.H. in Leesburg, Virginia.

8. D.B. was a resident of Mansfield, Massachusetts whom BINNEY enlisted to serve as a "straw buyer" for vehicles that ROYAL would purportedly sell to various customers. D.B. maintained a personal checking account with Bank of America, account ending in 6896.

9. J.R. was an associate of ROYAL who was the authorized representative for Global Export Holdings Inc. ("Global Export"). J.R. maintained a business checking account for Global Export with Wells Fargo, account ending in 3402.

10. M.G. was a resident of Alpharetta, Georgia, and a "straw buyer" for ROYAL. M.G. owned and operated Back to Balance Inc. and maintained a business bank account for Back to Balance with SunTrust, account ending in 1371.

11. S.D. was an acquaintance of A.H. and resident of Farmville, Virginia. On or about August 31, 2015, A.H. created Tropical Cosmetic Group LLC under the laws of the State of Florida. S.D. was listed as the authorized representative. The company was administratively dissolved on or about September 23, 2016. ROYAL and S.D. opened a business bank account for Tropical Cosmetic Group with Bank of America, account ending in 1537.

12. D.C. was a resident of Rowland Heights, California. D.C. was employed by Company #1, a freight company that specialized in exporting vehicles to Asian countries. Company #1 maintained a bank account with Wells Fargo, account ending in 1423.

13. Z.J.Y. was a resident of Temple City, California. Z.J.Y. owned Company #2, an auto-export company located in Los Angeles, California. Z.J.Y. maintained a business checking account for Company #2 with Far East National Bank, account ending in 2513. Z.J.Y. also maintained multiple business checking accounts for Company #2 with Bank of the West, including an account ending in 8810.

14. Z.F.Y. was a resident of Miami, Florida. Z.F.Y. bought, sold, and exported luxury vehicles to China. Z.F.Y. maintained a checking account with Bank of America, account ending in 5348, and a checking account with JPMorgan Chase, account ending in 8275.

15. S.J. was a resident of Milpitas, California. Company #3 was an auto-export

company run by S.J. S.J. maintained a business checking account for Company #3 with Wells Fargo, account ending in 1721.

16. A straw buyer was an individual who purchased a good or service on someone else's behalf. Once the purchase was made, the straw buyer typically transferred the good or service to the person for whom it was purchased.

17. AutoTrader.com was an online marketplace for the purchase and sale of new, used, and certified second-hand vehicles from dealers and private sellers.

# COUNT ONE
## (Conspiracy to Commit Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

18. The allegations contained in paragraphs 1 through 17 of this Indictment are realleged as if fully set forth herein.

19. From at least in or around April 2015 and continuing through at least in or around November 2016, in the Eastern District of Virginia and elsewhere, the defendants, JOHN BARON ROYAL and KEVIN JAMES BINNEY, did knowingly and intentionally conspire and agree with each other and with others, both known and unknown to the Grand Jury, to commit wire fraud – that is, having knowingly devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### *The Purpose of the Conspiracy*

20. It was the purpose of the conspiracy for ROYAL, BINNEY, and others to fraudulently represent that they had high-end vehicles for sale when, in truth and in fact, ROYAL, BINNEY, and others took money from the purchasers, never delivered the vehicles, and instead used the purchasers' money, at least in part, for their own personal use and benefit.

### *The Manner and Means*

ROYAL, BINNEY, and their co-conspirators employed various manners and means in furtherance of the conspiracy and scheme and artifice to defraud, including the following:

21. ROYAL and others approached straw buyers to purchase high-end and luxury vehicles at various dealerships, such as Land Rover and BMW, within the Eastern District of Virginia and elsewhere.

22. In some instances, to effectuate the purchases, ROYAL directed A.H. and others to alter bank statements to provide to the dealership to persuade the dealership that the purchaser could, in fact, afford the vehicle.

23. After the straw buyers purchased the vehicles, they would immediately turn the vehicles over to ROYAL.

24. ROYAL then solicited purchasers, often individuals of Asian heritage, for these vehicles on websites like AutoTrader.com advertising the vehicles for sale and/or for export.

25. ROYAL and others, at his direction, sent invoices to the purchasers reflecting the cost of the vehicle(s).

26. To convince the would-be purchasers that ROYAL would deliver the vehicles, ROYAL sent fake and fraudulent documentation to the purchasers, including bills of sale, shipping documentation, window stickers for the vehicles, and checks representing the vehicles were purchased free and clear of any liens. ROYAL also sent photographs to the purchasers of the vehicles. In some instances, those vehicles were not, in fact, in ROYAL's possession.

27. ROYAL and others at ROYAL's direction sent a series of communications to the purchasers designed to lull and reassure them that delivery of the vehicles was imminent when, in fact, ROYAL did not have the vehicles delivered as promised.

*Overt Acts*

28. ROYAL, BINNEY, and their co-conspirators committed overt acts in furtherance of the conspiracy in the Eastern District of Virginia and elsewhere, including the following:

**Fraudulent Conduct Related to D.C.**

29. In or around 2015, D.C. agreed to purchase six 2015 Ford Mustangs, a Range Rover, and a Mercedes-Benz GL450 from ROYAL.

30. ROYAL requested that D.C. provide a $10,000 deposit for the six Mustangs and a deposit of half the vehicle value for the Range Rover and the GL450.

31. ROYAL promised that he would ship the vehicles to D.C. once ROYAL received the deposits and that D.C. could pay the remainder of the vehicle costs once D.C. received the vehicles.

32. On or about April 7, 2015, ROYAL sent D.C. invoices requesting payment for the vehicles D.C. intended to purchase from ROYAL.

33. On or about April 8, 2015, J.R., at ROYAL's direction, opened a business bank account for Global Export with Wells Fargo in Chantilly, Virginia, within the Eastern District of Virginia.

34. On or about April 8, 2015 and April 9, 2015, D.C. deposited $46,000 into the Global Export Wells Fargo account to purchase the vehicles.

35. After D.C. deposited the money into the Global Export account, ROYAL did not, in fact, send the vehicles as he promised.

36. ROYAL further sent D.C. fake and fraudulent shipping information representing that he had shipped the Range Rover and GL450 to Company #1 when, as ROYAL knew, he had not shipped the vehicles to Company #1.

37. After falsely representing that the vehicles were shipped, ROYAL requested that D.C. provide the remaining funds.

38. On or about April 13, 2015, at ROYAL's direction, D.C. deposited an additional $165,955 into the Global Export Wells Fargo account to finalize the purchase of the vehicles.

39. ROYAL never provided any of the vehicles for which D.C. paid, nor did ROYAL ever return any of the funds D.C. paid for the vehicles.

**Fraudulent Conduct Related to Z.J.Y.**

40. In or around May 2015, BINNEY recruited D.B. to purchase a black interior, black exterior 2015 Range Rover HSE in Massachusetts.

41. In exchange for purchasing the vehicle, BINNEY promised D.B. $5,000.

42. In or around May 2015, Z.J.Y. located a 2015 Range Rover HSE for sale on Autotrader.com.

43. ROYAL provided Z.J.Y. with contact information for a person ROYAL falsely claimed was D.B. when, in truth and in fact, ROYAL provided Z.J.Y. with BINNEY's contact information.

44. BINNEY sent Z.J.Y. text messages impersonating D.B. to convince Z.J.Y. that the vehicle had been purchased.

45. ROYAL and BINNEY led Z.J.Y. to believe falsely that the vehicle had been purchased and was registered in the name of D.B.

46. On or about May 26, 2015, D.B. received two wire transfers into his Bank America account ending in 6896 to purchase the vehicle: (1) a $67,000 wire sent by A.H. from the HAB Capital One account and (2) a $35,000 wire sent by Z.J.Y. from a bank account in the name of Company #2.

47. Additionally, on or about May 22, May 27, and May 28, 2015, Z.J.Y. sent three wire transfers totaling $93,340 from Company #2's Far East National Bank account to the HAB Capital One account for purposes of purchasing the Range Rover Z.J.Y. believed was for sale.

48. ROYAL and BINNEY represented to Z.J.Y. that he would receive the vehicle after providing payment when, in fact, Z.J.Y. did not receive the vehicle, nor did ROYAL, BINNEY, or D.B. have possession of the vehicle.

49. The dealership in Massachusetts refused to sell the vehicle to D.B. ROYAL and BINNEY instructed D.B. to wire the money back to them. On or about May 29, 2015, D.B. wired $101,790 to the Capital Highline SunTrust account.

50. BINNEY nor ROYAL ever disclosed to Z.J.Y. that they instructed D.B. to return Z.J.Y.'s money to them.

51. Subsequently, BINNEY and ROYAL began to systematically withdraw and disburse a large portion of the funds from SunTrust banks throughout the Eastern District of Virginia and elsewhere.

52. Z.J.Y. attempted to communicate with the individual Z.J.Y. believed to be D.B. to inquire about the status of the vehicle purchase. BINNEY, pretending to be D.B., sent a series of false and fraudulent communications to Z.J.Y. providing explanations for the delay in the delivery of the vehicle.

53. ROYAL informed Z.J.Y. that he would return Z.J.Y's money when, in fact, ROYAL never returned Z.J.Y's money.

54. At no point during these communications did either ROYAL or BINNEY inform Z.J.Y. that BINNEY and ROYAL had withdrawn the funds that were to be used to purchase the vehicle.

## Fraudulent Conduct Related to Z.F.Y.

55. In or around September 2015, Z.F.Y. found a white Range Rover with a black top advertised for sale on AutoTrader.com by an individual named "Dr. Vic" through Tropical Cosmetic Group when, in truth and in fact, Dr. Vic was ROYAL.

56. On or about September 8, 2015, ROYAL provided Z.F.Y. with a fake and fraudulent bill of sale for the vehicle and a fake a fraudulent check to prove that the Range Rover was owned free and clear of any liens.

57. In order to complete the purchase of the vehicle, Z.F.Y., at the direction of ROYAL, wired $115,920 to the Tropical Cosmetic Group Bank of America account on or about September 8, 2015, and September 9, 2015.

58. ROYAL provided Z.F.Y. with a fake address for the business associated with Tropical Cosmetic Group to induce Z.F.Y. into believing that the business was legitimate.

59. ROYAL falsely promised Z.F.Y. that the vehicle would be delivered via a transportation company. On or about September 8, 2015, Z.F.Y. received a photograph of the Range Rover on a flatbed truck with the message "just loaded up," when, in truth and in fact, the vehicle Z.F.Y. paid for was never transported to Z.F.Y.

60. ROYAL never disclosed to Z.F.Y. that the money Z.F.Y. wired to purchase the vehicle would be used, at least in part, for the personal use and benefit of ROYAL and others.

61. Z.F.Y. received a series of materially false and fraudulent text messages from individuals purporting to be associated with ROYAL that were designed to lull and reassure Z.F.Y. that the vehicle would be delivered imminently:

    a. On or about September 8, 2015, Z.F.Y. received a text message from an individual identified as "Mike" which stated: "No problem dude we got

STRICT ORDERS to get you your car ASAP."

  b. On or about September 9, 2015, Z.F.Y. received a text message from "Mike" which stated: "Good morning we're on our way just finished up breakfast we we will be there in a couple hours Thanks Mike."

  c. After receiving that text message, Z.F.Y. received a subsequent text message on or about September 9, 2015, from "Mike" which stated: "Sorry I over slept [sic] a little but I was frickin exhausting were [sic] literally pulling out on 224 now headed STRAIGHT TO YOUR PLACE mike."

  d. On or about September 9, 2015, "Mike" sent Z.F.Y. an additional text message which stated, in part: "We swung by the address that you gave us but no one was there . . . ."

62. Z.F.Y. never received the vehicle, nor did ROYAL ever return the funds Z.F.Y. wired to pay for the vehicle.

**Fraudulent Conduct Related to S.J.**

63. On or about September 8, 2015, S.J. found a 2016 Range Rover on AutoTrader.com, which ROYAL had advertised for sale.

64. That same day, ROYAL sent S.J. an email containing information related to the same vehicle ROYAL purported to have sold to Z.F.Y. The fake and fraudulent information ROYAL sent to S.J. included a check and a bill of sale for the vehicle.

65. On or about September 14, 2015, A.H. transferred $5,000 from the HAB Capital One account in Leesburg, Virginia, within the Eastern District of Virginia, to a business owned by a straw buyer who purchased the vehicle that ROYAL told S.J. he would sell.

66. In order to purchase the vehicle, S.J. transferred $95,745 from Company #3 to the HAB Capital One account on or about September 14, 2015, and $24,000 on or about September 16, 2015.

67. ROYAL nor A.H. ever disclosed to S.J. that the money S.J. transferred to purchase the vehicle was used, at least in part, for ROYAL and A.H.'s own personal benefit.

68. ROYAL claimed that S.J.'s vehicle was being shipped to New Jersey when, as ROYAL knew, the vehicle was not being shipped to New Jersey.

69. ROYAL subsequently informed S.J. that the vehicle had been stolen or lost, when in truth and in fact, the vehicle had not been stolen or lost.

70. On or about September 30, 2015, ROYAL and M.G. filed a police report with the Leesburg Police Department in Leesburg, Virginia, within the Eastern District of Virginia, in which they reported the vehicle had been stolen. As ROYAL and M.G. knew, the police report was false and the vehicle had not, in fact, been stolen.

71. ROYAL instructed BINNEY to make the vehicle "disappear." BINNEY rented a storage unit in Leesburg, Virginia, within the Eastern District of Virginia, and then subsequently drove the vehicle to New Jersey and left it in a parking lot.

72. S.J. never received the vehicle, nor did S.J. receive any of the funds back that S.J. wired to the HAB Capital One account.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS TWO THROUGH FOUR
(Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

73. The allegations contained in paragraphs 1 through 72 of this Indictment are realleged as if fully set forth herein.

74. On or about the dates below, in the Eastern District of Virginia, the defendant ROYAL, having knowingly devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as set forth below, each such wire transmission being a separate count:

| Count | Date | Wire Communication |
|---|---|---|
| 2 | 5/22/2015 | Electronic communication to initiate the transfer of $45,000 from an account in the name of Company #2 at Far East National Bank, which communication was sent from a location outside the Commonwealth of Virginia to computers hosting Capital One's servers within the Eastern District of Virginia. |
| 3 | 9/8/2015 | Email from Royal to Z.F.Y. regarding purported sale of Range Rover. |
| 4 | 9/14/2015 | Electronic communication to initiate the transfer of $95,745 from an account in the name of Company #3 at Wells Fargo Bank, which communication was sent from a location outside the Commonwealth of Virginia to computers hosting Capital One's servers within the Eastern District of Virginia. |

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

# COUNT FIVE
## (Money Laundering Conspiracy)

THE GRAND JURY FURTHER CHARGES THAT:

*The Conspiracy*

75. By at least in or around May 2015 and continuing through at least in or around June 2015, in the Eastern District of Virginia and elsewhere, the defendants JOHN BARON ROYAL and KEVIN JAMES BINNEY did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

   a. to knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, which involved the proceeds of a specified unlawful activity, that is wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

   b. to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1957.

*Manner and Means of the Conspiracy*

76. The ways, manner, and means by which the conspirators sought to accomplish the conspiracy and its objectives included, but were not limited to, the following:

   a. Transferring and causing the transfer of fraudulently obtained proceeds between bank accounts in the United States.

   b. Dealing in cash, such as withdrawing fraudulently obtained proceeds from the Capital Highline SunTrust account.

(All in violation of Title 18, United States Code, Section 1956(h).)

## COUNTS SIX THROUGH EIGHT
(Money Laundering)

THE GRAND JURY FURTHER CHARGES THAT:

77. On or about the dates below, in the Eastern District of Virginia and elsewhere, the defendants JOHN BARON ROYAL and KEVIN JAMES BINNEY did knowingly conduct and attempt to conduct the following financial transactions affecting interstate commerce, which involved the proceeds of specified unlawful activity, that is wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

| Count | Date | Description of Financial Transaction |
|---|---|---|
| 6 | 6/3/2015 | Withdrawal of $5,000 cash from Capital Highline SunTrust account in Leesburg, Virginia. |
| 7 | 6/4/2015 | Withdrawal of $8,000 cash from Capital Highline SunTrust account in Falls Church, Virginia. |
| 8 | 6/4/2015 | Withdrawal of $7,000 cash from Capital Highline SunTrust account in Vienna, Virginia. |

(All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## Forfeiture Notice

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE AS DESCRIBED BELOW:

78. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, the defendants are hereby notified that, if convicted of the conspiracy and wire fraud offenses alleged in Counts One through Four above, those defendant(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy and wire fraud offenses alleged in Counts One through Four above, including, but not limited to, the following property:

   a. A sum of money, which is at least, $410,005 in United States currency, representing the amount of proceeds obtained as a result of the violations of Title 18, United States Code, Section 1343 and 1349, as described in Counts One through Four;

79. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, the defendants are also notified that, if convicted of any of money laundering offenses alleged in Counts Five through Eight above, the defendant(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real, or personal, involved in such offense, or any property traceable to such property, including but not limited to the following property:

   a. A sum of money, which is at least $101,790 in United States currency, representing the amount of property involved in the money laundering offense.

(All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 21, United States Code, Section 853(p), Title 28, United States Code, Section 2461(c) and Rule 32.2(a) of the Federal Rules of Criminal Procedure.)

A True Bill

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

_____                    _____
Date                                      Foreperson


    G. Zachary Terwilliger
    United States Attorney


By: _____
    Jamar K. Walker
    Assistant United States Attorney